IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JERRY SY DORSEY, #59398-019                                              PLAINTIFF

versus                                               CIVIL ACTION NO. 5:09cv12-DCB-MTP

TRACEY RUBIOLA, et al.                                             DEFENDANTS

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [22] filed by Defendants. Having reviewed the submissions of the parties, the entire record in this matter and the applicable law, the undersigned recommends that the motion be granted and that Plaintiff's claims against Defendants be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiff Jerry Sy Dorsey is a federal inmate currently incarcerated at the Federal Correctional Institution in Talladega, Alabama (FCI Talladega), serving a 35-month sentence on multiple federal convictions. He is currently scheduled to be released on May 30, 2010. Plaintiff was transferred to FCI Talladega from the Federal Correctional Complex in Yazoo City, Mississippi (FCC Yazoo City) - where the claims in the instant action arose - on or about October 21, 2008. *See* ecf. doc. no. 7-2 at 1.

Upon his arrival to FCC Yazoo City on May 15, 2008, Plaintiff was assigned to the D03 Range, Cell 128, Upper Bunk. *See* Declaration of Counselor Tracey Rubiola (Exh. A to Motion for Summary Judgment) at ¶ 2. Plaintiff alleges that during the intake screening process, he informed medical staff that he would have difficulty climbing up and down from a top bunk bed, because he had been shot years before in his knee and hand, and he was told that he would need to submit a sick call request in order to get a bottom bunk pass. *See* Cplt. at 2. The following morning, which was Friday, Plaintiff submitted a sick call request. *See id.* According to

Plaintiff, because of the weekend, the sick call request was not processed until the following week. *See id.* Plaintiff claims that he was so uncomfortable that he chose to sleep on a chair in the cell, rather than in his bed. *See id.* By Sunday, Plaintiff and his cellmate had apparently come to an agreement that Plaintiff could begin sleeping in the bottom bunk, prior to receiving the bottom bunk pass, in exchange for compensation. *See id.* at 2-3.

Plaintiff avers that on Monday morning (May 19), he went to Counselor Rubiola's office and told her that because of his medical situation, he needed to be moved to the bottom bunk. Counselor Rubiola told Plaintiff that she could not do anything until he got a medical profile from the doctor. Plaintiff avers that on Wednesday he was examined by a doctor at FCC Yazoo City, who issued him a bottom bunk profile. Plaintiff brought it to Counselor Rubiola and told her about the arrangement he had already worked out with his cellmate. Counselor Rubiola told Plaintiff to stay in the top bunk for now because she did not know if she was going to leave him in the same cell. According to Plaintiff, when he protested, Counselor Rubiola responded: "I don't care about any of that, you'll just have to get along with whomever I decide to move you in with. Now get out of my office and wait and see what I decide." Plaintiff claims that later that afternoon, Rubiola came to his cell and told him that he had been moved to Cell 216, and that he needed to "move after count." *See id.* at 3-4.

Plaintiff alleges that when he arrived at Cell 216, "the tension was already exposed." He avers that the inmate in that cell (Terry Jermaine Denson) "was infuriated about [him] moving into his cell and taking the bottom bunk."[1] Plaintiff went back to his old cell where his cellmate

---

[1] According to Plaintiff, Denson's first words to him where: "Damn why couldn't you stay in that cell you came from? That bitch is trippin' puttin' you in here dawg. I don't want no cellie. That nigga aint got no bottom bunk pass. You could've got his shit. I don't know what you gon' do, but you ain't gettin' my bunk dawg." Cplt. at 5. Plaintiff responded: "Look don't even stress it. I'm not trying to be in here with you anyway. I'ma holla at the officer since Ms. Rubiola is already gone and see what he can do." *Id.*

2

and Denson apparently got into a "loud exchange of words." Plaintiff told the officer of the unit that he could not move into Cell 216, and the officer told him that he would have to address that with Counselor Rubiola the following day.[2]  *See* Cplt. at 5-6.  According to Plaintiff, he and inmate Denson became involved in an altercation, culminating in him being punched by Denson in the jaw which "instantly knocked [him] into a state of unconsciousness."[3]  *See id.*

According to Counselor Rubiola, in the late afternoon or evening of May 27, 2008, Plaintiff presented Counselor Rubiola with a bottom bunk pass from the medical department, and Counselor Rubiola reassigned Plaintiff to the lower bunk of Cell 214.[4]  *See* Rubiola Decl. ¶¶ 3-4. Counselor Rubiola avers that prior to the move, she had spoken with Inmate Denson and advised him that he would need to move to the upper bunk, and he told her that it was "ok."[5]  *See id.* ¶ 3. Counselor Rubiola then notified Plaintiff of the cell change and left for the day.  *See id.*  The cell change was apparently made verbally by Counselor Rubiola, to be entered in the SENTRY system the following morning.  *See id.* ¶ 4.  Upon Rubiola's return to work on May 28, 2008, she was "surprised" to learn that inmate Denson had fought with Plaintiff, and that as a result of the fight, Plaintiff's jaw was injured.  *See id.* ¶ 5.  Rubiola avers that prior to moving Plaintiff, she "had no reason to believe that a fight would occur or that inmate Denson would behave in an aggressive manner towards inmate Dorsey."  *See id.* ¶ 6.  After the altercation, Plaintiff was

---

[2] According to Plaintiff, Counselor Rubiola had already left work for the day.  *See* Cplt. at ¶ 5.

[3] Plaintiff received an Incident Report for fighting, and was found guilty by the DHO on June 12, 2008.  Plaintiff appealed, and the case was remanded for rehearing.  Upon rehearing, the Incident Report was expunged from Plaintiff's file.  *See* Exhs. E, F & G to Cplt.

[4] As noted *supra*, Plaintiff avers that he was assigned to Cell 216, not Cell 214.

[5] Moreover, when he was assigned to Cell 214, Inmate Denson was told that if the bottom bunk were ever needed by an inmate with a bottom bunk pass, he would have to move to the top bunk.  Inmate Denson stated that there was "no problem."  *See* Rubiola Decl. ¶ 3.

3

housed in the Special Housing Unit (SHU). *See id.* ¶ 7.

Following the alleged assault, Plaintiff was brought to the Health Services Unit (HSU) by the Recreation Officer. *See* Exh. G to Motion for Summary Judgment at 66-71. An Injury Assessment was performed and treatment (cleansing, local anesthesia and a suture) was provided. *See id.* Plaintiff was then transported to the King's Daughters Hospital Emergency Room, where a CT Scan was performed, revealing an acute jaw fracture. *See id.* at 3, 69-70, 72. The following day, Plaintiff was transported to the University of Mississippi Medical Center (UMC) where he was evaluated by the oral surgery department and scheduled for oral surgery on June 2, 2008.[6] *See id.* at 4, 75. Pre-operation lab work was done on May 28, 2008, and Plaintiff was returned to FCC Yazoo City on May 29, 2008, where he was examined by Defendant Dr. Dixon Wise, Chief Dental Officer at FCC Yazoo City, and was provided with Amoxicillin, Peridex oral rinse, Ensure and Tylenol # 3, per orders of UMC. *See id.* at 4, 73, 74. Plaintiff was verbally instructed about the medications and he verbally indicated that he understood the instructions. *See id.* at 4.

On June 2, 2008, surgery was performed on Plaintiff, and follow-up was provided at the HSU. *See id.* at 22-25, 76-77. Despite being groggy, Plaintiff was found to be alert and oriented. *See id.* at 77. The following day, Plaintiff was evaluated and verbalized his current condition. *See id.* at 5. Plaintiff was seen again by the oral surgeon at UMC on June 10, 2008, who found the fixation to be stable and found no evidence of infection. *See id.* at 26, 80. A post-consultation visit was performed at the HSU, and Plaintiff was found to be well, alert and oriented, and without distress. *See id.* at 80. On June 17, 2008, Plaintiff was seen by Dr. Wise for a follow-up appointment, during which Plaintiff reported no pain. Plaintiff was also given

---

[6] It could not be done on May 28 because of the swelling. *See* Exh. G to Motion for Summary Judgment at 73.

another prescription for Peridex oral rinse. *See id.* at 6. Thereafter, on July 9, 2008, Plaintiff was seen by Dr. Wise, and reported to him that two wires had come out. Plaintiff reported no pain and verbalized his understanding of Dr. Wise's instructions. He was given more Ensure and Peridex oral rinse. *See id.* at 8. The following day, Dr. Wise was informed by a nurse that Plaintiff had removed the rest of his wires. *See id.* at 9. Plaintiff again reported no pain, and Dr. Wise noted that Plaintiff had been scheduled for a follow-up appointment with the oral surgeon. *See id.*

On July 11, 2008, Plaintiff was seen by the oral surgeon at UMC. Plaintiff told him that he had removed the wires "a week ago." *See id.* at 26-27. The oral surgeon replaced the wires and prescribed Amoxicillin, as well as certain other medications. *See id.* at 10, 26-27. The following day, Plaintiff was seen by medical staff at FCC Yazoo City for follow-up. *See id.* at 82. The medications prescribed by the oral surgeon were ordered, and Plaintiff verbalized his understanding to the plan of care counseling. *See id.* On July 14, 2008, Plaintiff was seen by Dr. Wise. When asked why he had removed the wires, Plaintiff replied that when one of the wires came loose, he pulled on it until it came out, and since it did not hurt, he decided to remove the rest of the wires. *See id.* at 10. Dr. Wise instructed Plaintiff on the medications that had been prescribed, and was told that removing the wires could "jeopardize his treatment outcome." *See id.* Plaintiff agreed to notify medical staff if he had any pain or swelling, and he verbalized his understanding to the instructions. *See id.* at 10-11.

Plaintiff was seen again by the UMC oral surgeon on July 18, 2008. The oral surgeon noted that Plaintiff had maintained his wires and said that he had taken the antibiotics. The surgeon also noted that Plaintiff needed to have his fractures stabilized and sites debrided of infected tissue. *See id.* at 28. Several days later, Dr. Wise refilled Plaintiff's antibiotics prescription, after speaking with the oral surgeon. *See id.* at 12. The following week, on July 24, 2008, Plaintiff was seen by the oral surgeon at UMC, who stabilized the fracture and debrided

5

the infected areas. *See id.* at 29-30. Plaintiff was discharged with special instructions and medications, including Amoxicillin, and a follow-up appointment was scheduled for July 30. *See id.* at 31. On July 24, 2008, Plaintiff was evaluated at HSU. *See id.* at 15. Against the doctor's orders, Plaintiff had removed his bandages. *See id.* The bandages were replaced and Plaintiff was provided the medications prescribed by the oral surgeon. *See id.* Plaintiff refused his medications, including Amoxicillin, on July 28, 2008. *See id.* at 35-36. The following day, Dr. Wise noted that Plaintiff had refused his medications and had also refused to be brought over to HSU for education and counseling. *See id.* at 17, 37.

Plaintiff was seen by the UMC oral surgeon on July 30, 2008, who removed the sutures and discontinued the antibiotics.[7] *See id.* at 85-86. On August 21, 2008, Plaintiff was seen by Dr. Wise. Plaintiff stated that he had no pain whatsoever, and Dr. Wise did not observe any swelling in the jaw, face or mouth. Plaintiff stated that he wanted the wires removed at the next oral surgeon appointment, and he was advised to discuss the matter with the surgeon during the next appointment. *See id.* at 18. On August 27, 2008, Plaintiff told Dr. Wise that he was ready to have his wires removed as soon as possible, and reported that he was not having any pain. *See id.* at 21. On September 5, 2008, Plaintiff's wires were removed, and he reported that he was no longer in pain. *See id.* at 97.

Plaintiff filed his *pro se Bivens*[8] Complaint [1] on February 4, 2009. Plaintiff alleges that Counselor Rubiola failed to protect him - specifically, that rather than moving him to Cell 216,

---

[7] Plaintiff continued to receive Ranitidine (for acid reflux), Peridex dental rinse and Ensure, although he refused these treatments on numerous occasions. *See*, *e.g.*, Exh. G at 39-52, 87-96.

[8] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). A *Bivens* action mirrors a civil rights action brought under 42 U.S.C. § 1983, the difference being that a *Bivens* action applies to alleged constitutional violations by federal actors, while a section 1983 action applies to alleged constitutional violations by state actors. *See Izen v. Catalina*, 398 F.3d 363, 367 n.3 (5th Cir. 2005).

6

she should have kept him in his original cell, and by not doing so she was "deliberately indifferent to [his] safety" and she "exposed [him] to an assault." *See* Cplt.; *see also* Response [7] to Court Order. Plaintiff also alleges that he did not receive proper medical care by Dr. Wise following the alleged assault by inmate Denson, and that as a result, he suffered an infection in his mouth and resulting pain and suffering. Specifically, Plaintiff claims that Dr. Wise is liable for "not medically specifying the administering of amoxicillin after Plaintiff was brutally assaulted and before Plaintiff's surgery on June 2, 2008." *See* Response [7] to Court Order at 8. Plaintiff also avers that the amoxicillin capsules were placed inside his cell after he returned from surgery, but he was "unable to know what was being said to him because he was not only in a lot [sic] of pain but under the medications and coming off the surgery sedation medication." *See* Reply at 5. Thus, Plaintiff argues, he "can not be held accountable for administering his own medication from a surgery like this." *See id.*

## STANDARD FOR SUMMARY JUDGMENT

Because Defendants have submitted matters outside the pleadings with their Motion to Dismiss or, in the Alternative, for Summary Judgment [93], the motion should be characterized as a motion for summary judgment. *See* Fed. R. Civ. P. 12(b); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir. 1991). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper "where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof." *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir. 1988). "A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact." *Id.*

This court may grant summary judgment only if, viewing the facts in a light most

7

favorable to the plaintiff, the defendant demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995). If the defendant fails to discharge the burden of showing the absence of a genuine issue concerning any material fact, summary judgment must be denied. *John v. State of Louisiana,* 757 F.2d 698, 708 (5th Cir. 1985). The existence of an issue of material fact is a question of law that this court must decide, and in making that decision, it must "draw inferences most favorable to the party opposing the motion, and take care that no party will be improperly deprived of a trial of disputed factual issues." *Id.* at 712 (quoting *U.S. Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975)).

There must, however, be adequate proof in the record showing a real controversy regarding material facts. "Conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 902 (1990), unsubstantiated assertions, *Hopper v. Frank*, 16 F.3d 92, 96-97 (5th Cir. 1994), or the presence of a "scintilla of evidence," *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994), is not enough to create a real controversy regarding material facts. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

ANALYSIS

As an initial matter, Defendants argue that Plaintiff has failed to exhaust his administrative remedies. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. § 1983 or "any other Federal law." Accordingly, federal prisoners filing suit under *Bivens* "must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit." *Porter v. Russels*, 534 U.S. 516, 524 (2002); *see also Schipke v. Van Buren*, 239 Fed. Appx. 85, 86 (5th Cir. Aug. 30, 2007). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot

be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citations omitted).[9]

"Exceptions to the exhaustion requirement are appropriate where the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action." *Schipke*, 239 Fed. Appx. at 86 (quoting *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir.1994)). The Fifth Circuit has taken the position that exceptions to the exhaustion requirement only apply in "extraordinary circumstances," and the prisoner bears the burden of demonstrating the futility or unavailability of administrative review. *Id.*

It appears that Plaintiff has failed to exhaust his administrative remedies, as there are no administrative remedy filings in the BOP's records regarding Plaintiff's claims in the instant action.[10] *See* Exh. F to Motion to Dismiss. Plaintiff argues that he attempted to exhaust his administrative remedies, but that they were "not made available to him by the FCI Yazoo,

---

[9] The BOP's Administrative Remedy Program ("ARP") is set forth at 28 C.F.R. § 542.10, *et seq.* The first step of the ARP process is the informal presentation of the issue to prison staff via a BP-8 form. If that does not resolve the issue, the inmate must submit a formal Request for Administrative Remedy to the warden, using a BP-9 form. If the inmate is not satisfied with the warden's response to that request, he or she may submit an appeal to the appropriate BOP regional director via a BP-10 form, and may then appeal that decision to the General Counsel via a BP-11 form. That step "is the final administrative appeal" and its completion, therefore, constitutes exhaustion of administrative remedies.

[10] Plaintiff did file separate administrative tort claims against Defendants Rubiola and Dr. Wise (which were denied because Plaintiff failed to establish that staff negligence had caused him to be assaulted, nor did he establish that he did not receive adequate medical care). *See* Exhs. A1, B, D & D1 to Cplt. However, the exhaustion requirements under the PLRA and the Federal Tort Claims Act are separate and distinct, and the satisfaction of one does not constitute satisfactions of the other. *See Lopez-Heredia v. Univ. of Texas Medical Branch*, 240 Fed. Appx. 646, 647 (5th Cir. July 6, 2007) ("The BOP's FTCA claims procedure is separate from the BOP's administrative remedies procedure.") (citation omitted); *Macias v. Zenk*, 495 F.3d 37, 43-44 (2d Cir. 2007) (prisoners "cannot satisfy the PLRA's exhaustion requirement solely by filing...administrative tort claims."); *Steele v. Federal Bureau of Prisons*, 100 Fed. Appx. 773, 776 (10th Cir. June 7, 2004) ("filing an FTCA claim would not exempt [inmate] from the PLRA exhaustion requirement...."); *Burnette v. U.S. Bureau of Prisons*, 2006 WL 3524040, at * 2 (W.D. La. Dec. 6, 2006) ("the exhaustion procedures for tort claims under the FTCA are separate and distinct from the exhaustion requirements for a *Bivens* or other type of claim.").

9

Counselor, Case Manager, and/or any other Unit Team that came through the SHU (Special Housing Unit), on a weekly basis." *See* Plaintiff's Response [26] at 1. Specifically, Plaintiff argues that for two weeks prior to July 10, 2008, he was trying to obtain the BP-8 and BP-9 forms[11] from his Counselor, Defendant Tracey Rubiola. He claims that he asked "everyone" who passed by his cell - other Counselors and Case Managers, as well as the Warden and Associate Wardens - for these forms, but they either ignored him or refused. He claims that on July 10, 2008, he finally "jacked the food slot,"[12] which caused a commotion and SHU correctional officers finally had a counselor bring him a BP-10, rather than a BP-8 or BP-9. *See* Response [26] at 2. Plaintiff also claims that Rubiola told him several times that she would bring him the BP-8 and BP-9, but she never did. *See id.*

Defendant Rubiola avers that at no time did she purposely fail to provide Plaintiff with any of the Administrative Remedy forms he requested while he was in the SHU. *See* Rubiola Decl. ¶ 7. Rubiola can only recall Plaintiff asking for a tort claim form, which he was given. *See id.* Rubiola states that had Plaintiff asked for any other forms, he would have been given them. *See id.* She avers that she makes SHU rounds every week and she always carries BOP forms with her to issue to the inmates. *See id.*

Plaintiff also argues that he "was in no position and/or coherent enough and/or medically capable of filing any paperwork, i.e. exhaustion of administrative remedies." *See* Reply [26] at 1. Specifically, he claims that he was under the influence of medications and was in pain and discomfort following his jaw surgery (on June 2, 2008) and, therefore, the 20-day period for filing his grievance should be waived. *See id.* at 1-2. However, the court notes that Plaintiff was

---

[11] The regulations require that grievances be submitted on the appropriate forms. *See* 28 C.F.R. §§ 542.14(a), 542.15(b). Prisoners "shall obtain the appropriate form from ... institution staff (ordinarily, the correctional counselor)." 28 C.F.R. § 542.14(c)(1).

[12] Plaintiff explains that he "held his arm outside of it [the food slot] so that it could not be closed." *See* Response [26] at 2.

10

able to attend and participate in a Disciplinary Hearing Officer hearing and prepare and file a Claim for Damage, Injury or Death with a supporting affidavit all within thirty days from the June 2, 2008 surgery. *See* Exh. E to Motion for Summary Judgment; Exhs. A1, B, D & D1 to Cplt.

"If the institutional authorities refuse to provide a prisoner with the forms needed to exhaust administrative remedies, then those remedies are not 'available' to the prisoner." *Aceves v. Swanson*, 75 Fed. Appx. 295, 296(5th Cir. Sept. 17, 2003). Administrative remedies may be also deemed "unavailable" where 1) an inmate is unable to file a grievance because of physical injury and 2) the inmate attempts to exhaust administrative remedies by filing a grievance as soon as the injury improves. *See Mingleton v.* Wright, 2007 WL 1732388, at * 2 (N.D. Tex. June 14, 2007) (citing *Days v. Johnson*, 322 F.3d 863, 868 (5th Cir. 2003)). There is considerable dispute between the parties as to whether either of these exceptions should excuse Plaintiff's failure to exhaust. Nevertheless, as the court finds below that Defendants are entitled to summary judgment on Plaintiff's claims on their merits, the issue of exhaustion is rendered moot.

<u>Failure to Protect</u>

Prison officials have a duty under the Eighth Amendment to protect inmates from violence at the hands of other prisoners. *Hill v. Thomas*, 2009 WL 1181504, at * 1 (5th Cir. May 1, 2009 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Horton v. Cockrell*, 70 F.3d 397, 400-01 (5th Cir. 1995)). However, not every injury "by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* (*citing Farmer*, 511 U.S. at 834). To prevail on a failure to protect claim, the Plaintiff must show that "he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999). "In order to act with deliberate indifference, 'the [defendants] must both be aware of the facts from which the inference could be drawn and that a substantial

11

risk of serious harm exists, and he must also draw the inference.'" *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995) (quoting *Farmer*, 511 U.S. at 537). In other words, Plaintiff must show that Defendant Rubiola disregarded a risk of harm that was *actually known* to her. *See*, *e.g.*, *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) (holding that defendant officers were not deliberately indifferent where there was no evidence that they "were aware of [plaintiff's] activities as an informant, that he had previously requested to be removed from lockdown, or that he had made a life-endangerment claim...on the evening before the attack."). Mere negligence in failing to protect a prisoner from an assault, knowledge of isolated incidents, or failure to follow standard procedures, do not form the basis of a failure-to-protect claim. *See Hill*, 2009 WL 1181504, at * 1 (citing *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990)); *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

Plaintiff does not dispute the averments made by Rubiola in her Declaration - that prior to moving Plaintiff, she "had no reason to believe that a fight would occur or that inmate Denson would behave in an aggressive manner towards inmate Dorsey," because she had spoken with Denson and he had told her that moving Plaintiff into his cell would be "ok." *See* Rubiola Decl. ¶ 6. Indeed, Plaintiff concedes that "Rubiola did not know that Plaintiff would be assaulted by this specific inmate or inmates who eventually assaulted Plaintiff." *See* Response [7] to Court Order at 7. At most, Plaintiff appears to be alleging that Defendant Rubiola was negligent in moving him to Denson's cell. *See*, *e.g.*, Response at 7 (stating that "Rubiola should have used better correctional judgment, to alleviate any unrest, which is usually caused when another inmate has to give up their bottom bunk to someone that they don't know or deal with."). Accordingly, Plaintiff has failed to establish that Defendant Rubiola was deliberately indifferent to his need for protection, as he has failed to allege, much less establish, that she was aware of - and disregarded - a risk of harm that was actually known to her. Thus, this claim should be dismissed.

Denial of Medical Treatment

Plaintiff contends that Dr. Wise was deliberately indifferent "by not medically specifying the administering of amoxicillin" after the alleged assault and prior to his surgery, when Dr. Wise knew "that osteomyelitis, (an infection) would occur if an antibiotic such as amoxicillin, is not administered pre-surgery." *See* Response [7] to Court Order at 8. Plaintiff also avers that the amoxicillin capsules were placed inside his cell after he returned from surgery, with Plaintiff "unable to know what was being said to him because he was not only in a lot [sic] of pain but under the medications and coming off the surgery sedation medication." *See* Reply [26] at 5. Thus, Plaintiff argues, he "can not be held accountable for administering his own medication from a surgery like this." *See id.*

"Prison officials violate the constitutional proscription against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing so constitutes unnecessary and wanton infliction of pain." *Davidson v. Texas Dep't of Criminal Justice*, 91 Fed. Appx. 963, 964 (5th Cir. Mar. 19, 2004), *cert. denied*, 543 U.S. 864 (2004), (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The Fifth Circuit has noted that deliberate indifference "is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may not be held liable under this standard pursuant to Section 1983 unless the Plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Id.* at 838.

To successfully make out a showing of deliberate indifference, plaintiff must "submit

evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Davidson*, 91 Fed. Appx. at 965 (quoting *Domino*, 239 F.3d at 756). "Unsuccessful medical treatment, ordinary acts of negligence, or medical malpractice do not constitute a cause of action under § 1983." *Id.* (citing *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999)). The plaintiff is not entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006). Additionally, a prisoner's mere "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001).

Plaintiff's medical records, as detailed above, demonstrate that he received ongoing treatment and care at FCC Yazoo City by Dr. Wise and other medical personnel, not only in the immediate aftermath of the alleged assault, but during the period of time leading up to and following his oral surgery. *See* Exh. G to Motion for Summary Judgment. More pertinently, Plaintiff's medical records demonstrate that he was dispensed Amoxicillin at FCC Yazoo City, as prescribed by doctors at UMC, on May 28, 2008. *See id.* at 4, 74. Plaintiff was verbally instructed about the medication and he verbally indicated that he understood the instructions. *See id.* at 4. The court further notes that when Plaintiff was seen in a follow-up visit by the oral surgeon at UMC on June 10, 2008, the surgeon found no evidence of infection. When Plaintiff was seen the following week at UMC, Plaintiff reported that he had been taking his antibiotics. *See id.* at 28. Several days later, Dr. Wise spoke with the oral surgeon, who advised him that Plaintiff's antibiotics should be refilled, and they were. *See id.* at 12. Plaintiff was given more Amoxicillin by medical staff at FCC Yazoo City following his visit to the oral surgeon on July 11, 2008. *See id.* at 10, 26-27, 82. Plaintiff continued to receive medical care by Dr. Wise until early September 2008, when Plaintiff's wires were removed and he reported that he no longer

14

had any pain.  *See id.* at 97.

In short, the medical records belie Plaintiff's allegations that Dr. Wise was deliberately indifferent to his serious medical needs.  *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegation of deliberate indifference.") (*citing Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)).  Although Plaintiff did ultimately develop an infection in his mouth, he has failed to establish that it resulted from any deliberate indifference on Dr. Wise's part.  Indeed, no infection was noted until Plaintiff's July 11, 2008 visit to the oral surgeon, after Plaintiff had taken it upon himself to remove the surgical appliance from his mouth, without medical authorization and against explicit doctor's orders.  *See* Exh. G at 9-11, 26-27.

Moreover, Plaintiff's allegations that he was incapable of understanding the instructions regarding the medications and that he had no idea what the medication was for, are wholly conclusory and are insufficient to create a genuine issue of material fact to withstand summary judgment.  In opposing summary judgment, "[i]t is not enough for [Plaintiff] to rest on mere conclusory allegations or denials in his pleadings...[Plaintiff] must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of his case." *Park v. Stocksill Boat Rentals, Inc.*, 492 F.3d 600, 605 (5th Cir. 2007) (citations omitted); *see also Paul Kadair, Inc.* v. Sony Corp.*,* 694 F.2d 1017, 1030 (5th Cir. 1983) (("a plaintiff cannot defeat a motion for summary judgment by merely restating conclusory allegations contained in his complaint....").

Finally, in his Reply [26], Plaintiff - for the first time - complains that Dr. Wise prescribed him Amoxicillin in capsule form, rather than in liquid form, but that he was unable to swallow pills.  *See* Reply at 5.  This argument, too, is belied by the medical records.  Indeed, after the June 2, 2008 surgical procedure, Dr. Wise did, in fact, order that Plaintiff's antibiotics be

15

crushed and/or dissolved in water.[13] *See* Exh. G at 78. In addition, on July 12 and July 14, 2008, Plaintiff was prescribed Amoxil with instructions to open the capsule and dissolve it in water. *See id.* at 11, 83. Again, on July 21, 2008, Dr. Wise prescribed Amoxicillin in liquid form, and when the Amoxicillin was discontinued on July 31, 2008, the instruction was to provide it by teaspoon. *See id.* at 12, 87. Thus, this allegation, which is unsupported by any evidence in the record, is insufficient to defeat Defendants' Motion for Summary Judgment.

For the foregoing reasons, Plaintiff's claims against Dr. Wise should be dismissed.

## RECOMMENDATION

For the reasons stated above, it is the recommendation of this court that Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [22] be granted, and that Plaintiff's claims against Defendants be dismissed with prejudice.[14]

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules and 28 U.S.C. § 636(b)(1), any party within ten days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. The parties are hereby notified that failure to file written objections to the proposed

---

[13] Apparently, the oral surgeon at UMC did not instruct the medications to be diluted or liquified.

[14] Although Defendants have raised the defense of qualified immunity, "if it becomes evident that the plaintiff has failed to state or otherwise to establish a claim, then the defendant[s][are] entitled to dismissal on that basis." *Wells v. Bonner*, 45 F.3d 90, 93 (5th Cir. 1993) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991)); *see also Sappington v. Bartee*, 195 F.3d 234, 236 (5th Cir. 1999). Thus, because the court has found that Plaintiff has failed to establish his claims against Defendants, it need not reach the question whether Defendants are entitled to qualified immunity. *Wells*, 45 F.3d at 93.

findings, conclusions, and recommendations contained within this report and recommendation within ten days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS, the 28th day of October, 2009.

s/ Michael T. Parker  
United States Magistrate Judge